[No. B032334. Second Dist., Div. Five. June 15, 1989.]

PATRICE F. EVART, Plaintiff and Appellant, v.
STEVE SULI et al., Defendants and Respondents.

COUNSEL

Michael F. Kushner for Plaintiff and Appellant.

Marrone, Robinson, Frederick & Foster, Linda B. Bulmash, Roper & Folino and Michael J. Irwin for Defendants and Respondents.

OPINION

BOREN, J.—The question presented by this appeal is whether, as a matter of law, a plaintiff is barred from recovering for injuries she sustained as a result of biting into a piece of bone hidden inside a hamburger patty.

## FACTS

Plaintiff/appellant Patrice F. Evart broke a tooth when she bit into a "hard substance" in a hamburger sandwich at a restaurant. Although Evart does not know precisely what type of hard substance the hamburger contained (because she swallowed it), for purposes of this appeal it is agreed that the substance was a piece of beef bone. Defendants/respondents East Coast Trading, Inc., and Steve Suli (doing business as Tip Top Meats and Deli) are the manufacturers, distributors, suppliers, and sellers of the hamburger patty in question here. Evart's complaint alleges theories of negligence, breach of the implied warranty of merchantability, strict liability, res ipsa loquitur, and negligence per se.

In November of 1987, respondent Suli filed the motion for summary judgment which concerns us here. Respondent East Coast Trading joined in Suli's motion. Respondents contended, in essence, that a piece of bone in ground meat is not a "foreign substance" but rather is "safe" and "natural" to the product, and a substance which a consumer should reasonably expect to encounter in a hamburger patty. Thus, respondents argued, the manufacturer of a bone-containing hamburger is not liable as a matter of law to a consumer who is injured by the bone. In opposition, Evart asserted that a bone-containing hamburger was an "adulterated" product as a matter of law, and that the question of whether a consumer should expect to meet a bone in ground meat was a triable issue of fact.

The trial court granted the respondents' motion for summary judgment. Evart appeals.

DISCUSSION

1. *Is a Hamburger Containing Bone Matter "Adulterated"?*

■ Evart relies on the provisions of the Sherman Food, Drug, and Cosmetic Law (Health & Saf. Code, § 26000 et seq.) in support of her argument that ground beef which contains a piece of bone is an "adulterated" product as a matter of law. She seeks to prove that an adulteration violating the Sherman Law establishes negligence per se.

The portions of the Sherman Law relating to adulterated food are contained in chapter 5, article 3 (commencing with § 26519 of the Health & Saf. Code; all further statutory references are to this code unless otherwise indicated). Sections 26534, 26535 and 26536 prohibit the adulteration of food and the sale or delivery of adulterated food. The statutory definitions of what constitutes "adulterated food" move from the general to the specific. Section 26520 states that "Any food is adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to health of man or any other animal that may consume it. The food is not considered adulterated if the substance is a naturally occurring substance and if the quantity of such substance in the food does not render it injurious to health."

In addition, a food is considered to be adulterated if one of its valuable constituents is omitted, or if other substances are substituted, or if it contains concealed damage, or if any substance has been added to the food product to increase its bulk, reduce its quality or make it appear better than it actually is. (§ 26528.)

Other sections within the Sherman Law amplify the definition contained in section 26520, barring, for example, substances which are poisonous or declared unsafe by regulation (§ 26521), "unsafe additives" (§ 26522), "diseased, contaminated, filthy, putrid, or decomposed substance[s]" (§ 26523), food produced under unsanitary conditions (§ 26524), products from diseased animals (§ 26525) and so on. One such section specifically addresses the adulteration of ground beef or hamburger: it says, "Any food is adulterated if it is chopped or ground beef or hamburger unless it is composed of voluntary striated muscle of fresh beef which does not contain any substance that is not approved by the department [of Health Services] and unless it has a total fat content which is not in excess of 30 percent by weight." (§ 26532.) Appellant reasons that because a bone fragment is not "muscle of fresh beef," the hamburger she ate was adulterated under section 26532. We disagree, because we believe her interpretation of section 26532 is taken out of context and ignores the preceding, related code sections.

When the Sherman Law statutes are read as a whole, it becomes apparent that the problem the Legislature was addressing was the sale of intrinsically unhealthful food—food which is adulterated by the use of hidden fillers or extenders, or chemical additives or preservatives, or is decayed, filthy or diseased, or prepared under unsanitary conditions, or otherwise dangerous. A fragment of beef bone in a hamburger does not fit into any of these categories; rather, it is a "naturally occurring substance." Naturally occurring substances are acceptable under section 26520, *supra,* so long as they are not present in such quantity as to make the food product injurious to health.[1] Therefore, we reject appellant's argument that a hamburger containing a piece of beef bone is adulterated as a matter of law.

In this case, Evart conceded that the "hard substance" which caused her injury was a beef bone. Thus, the requirement that the food product contain only naturally occurring substances is satisfied. Nevertheless, the defendants have not presented any evidence to show that the bone in this case (or the bone particles generally contained in their ground beef) is of a size and quantity which is not injurious to the health of the consumer within the meaning of section 26520, and which conform to applicable federal regulations.

Respondents therefore failed to carry their burden of proving in their moving papers that their product was not "adulterated," and summary judgment should therefore not have been granted on this issue. Incidentally, we point out to respondents that Evart, in using the Health and Safety Code statutes regarding the adulteration of food, is not acting as a "private attorney general" prosecuting a criminal case. Rather, the statutes are being used in a civil context to establish negligence per se under section 669 of the Evidence Code. (See *Clinkscales* v. *Carver* (1943) 22 Cal.2d 72, 75 [136 P.2d 777].)

2. *Are Food Manufacturers and Sellers Not Responsible for Potentially Dangerous Natural Substances Contained in Their Products as a Matter of Law?*

Respondents argue that summary judgment was proper as a matter of law because any consumer who bites into a hamburger should expect to

---

[1] California looks to the federal regulations to determine "good manufacturing practices" for any food. (§§ 26209 and 26210.) Although the Code of Federal Regulations specifies the size and amount of bone particles which may be contained in mechanically processed meat (for example, 9 C.F.R. § 319.5(a) states that no bone particle shall be larger than 0.85 millimeter in its greatest dimension), it forbids the use of mechanically processed meat in hamburger or ground beef. (9 C.F.R. § 319.6(d).) On the other hand, "beef patties" may be comprised of mechanically processed meat. (9 C.F.R. § 319.15(c).) In this case, it is unclear whether the federal regulations for bone particles apply because the meat consumed by Evart is variously referred to as a "hamburger" and a "patty."

find a bone therein, and he alone is responsible for guarding himself against injury. Appellant contends this is a jury question.

Respondents' argument is based upon the Supreme Court's decision in *Mix* v. *Ingersoll Candy Co.* (1936) 6 Cal.2d 674 [59 P.2d 144]. In *Mix,* the plaintiff was injured when he swallowed a sharp sliver of chicken bone contained inside a chicken pie. After concluding that the plaintiff could state a cause of action for breach of the implied warranty of merchantability under former Civil Code section 1735 because the furnishing of food constituted a sale, the court next addressed the question of whether plaintiff could recover on this theory.[2] The court observed that the finder of fact is frequently responsible for determining whether a particular alleged defect in food rendered an item not reasonably fit for consumption. Despite this observation, the court itself determined that, first, because chicken bones were natural to chicken meat (unlike stones, wires, glass, or nails), and, second, because it is "a matter of common knowledge [that] chicken pies occasionally contain chicken bones," the plaintiff was barred from recovering on an implied warranty or negligence theory as a matter of law because he should have reasonably anticipated the bone and taken measures to guard against injury. (6 Cal.2d at p. 682.) The court offered several additional examples of cases in which no liability should attach: these examples were a bone natural to the meat in a T-bone steak or beef stew, a fish bone in a fish dish, or a cherry stone in a cherry pie. (*Ibid.*)[3]

[2] Former section 1735 of the Civil Code provided, "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: [¶] (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." Section 1735 was repealed by Statutes 1963, chapter 819, in which the Legislature at the same time enacted California Uniform Commercial Code section 2314. The new statute provides, "(1) Unless excluded or modified (Section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale. [¶] (2) Goods to be merchantable must be at least such as . . . [¶] (c) Are fit for the ordinary purposes for which such goods are used; . . ."

[3] Though we have no bone to pick with the Supreme Court, we do note that virtually every state which has cited *Mix* following adoption of the Uniform Commercial Code provision we have cited in footnote 2 has questioned the court's apparent willingness to accept the existence of harmful, though "natural," substances in prepared foods. These cases include *Ex Parte Morrison's Cafeteria of Montgomery, Inc.* (Ala. 1983) 431 So.2d 975, 978; *Williams* v. *Braum Ice Cream Stores, Inc.* (Okla.App. 1974) 534 P.2d 700, 702; *Jeffries* v. *Clark's Restaurant Enterprises* (1978) 20 Wn.App. 428 [580 P.2d 1103, 1104]; *Jim Dandy Fast Foods, Inc.* v. *Carpenter* (Tex.App. 1976) 535 S.W.2d 786; *Hochberg* v. *O'Donnell's Restaurant, Inc.* (D.C.App. 1971) 272 A.2d 846, 848; and *Zabner* v. *Howard Johnson's Incorporated* (Fla.App. 1967) 201 So.2d 824, 826. The reasoning common to all of these cases is that a jagged natural substance ingested by the consumer may cause as much if not more physical

Respondents seek to apply the reasoning of the *Mix* case to the facts alleged in this case. The problem with respondents' endeavor is that the facts alleged in this case do not satisfy *both* parts of the *Mix* two-prong analysis. The first prong is satisfied because appellant has conceded that the hard substance in the hamburger was a beef bone. However, we are not prepared to state that it is a matter of common knowledge that hamburgers contain pieces of beef bone large enough to cause injury to a consumer. ■ By definition, an item which is "ground" is finely chopped, pulverized, comminuted . . . in other words, put through a grinder. The facts of the *Mix* case itself—along with the other examples offered by the court— are all distinguishable from this case because none of those examples involve food products which are supposed to have been put through a grinder.

■ We therefore conclude that this is not the type of case which allows us to say as a matter of law that the defect did not render the food product unfit for consumption. In so deciding, we disagree with the interpretation of *Mix* offered by respondents, who suggest that *Mix* mandates a finding of fitness any time the object causing injury is natural to the food being consumed. On the contrary, the *Mix* court emphasized several times that the substance causing injury must not only be natural to the type of food, but must also be one which, in common knowledge, should be "reasonably anticipated" by the consumer. (6 Cal.2d at p. 681.)[4] The court held that the consumer had no right to anticipate or expect an entirely boneless chicken pie because it was a matter of common knowledge that chicken pies contain chicken bones. We do not believe this holding establishes a blanket rule forbidding an inquiry into what a consumer might reasonably expect (or anticipate, to use the court's wording) in cases in which the existence of a potentially harmful natural substance in a food product is *not* a matter of common knowledge. This is such a case.

---

damage than a pebble, wire or other foreign substance. In *Goodwin* v. *Country Club of Peoria* (1944) 323 Ill.App. 1 [54 N.E.2d 612], for example, plaintiff's decedent died of serious internal injuries after ingesting a sharp sliver of turkey bone.

[4] Other jurisdictions which have cited the *Mix* case with approval and adopted its "foreign-natural" distinction also adopt the second prong of the *Mix* analysis regarding common knowledge and the reasonable expectations of the consumer. (See, for example, *Adams* v. *Great Atlantic & Pacific Tea Co.* (1960) 251 N.C. 565 [112 S.E.2d 92, 98] (crystalized grain in corn flakes); *Allen* v. *Grafton* (1960) 170 Ohio St. 249 [164 N.E.2d 167, 174-175] (oyster shell in oyster); *Goodwin* v. *Country Club of Peoria, supra,* 54 N.E.2d 612, 615 (turkey bone in creamed turkey dish).) Two California appellate courts have been confronted with similar facts: *Lamb* v. *Hill* (1952) 112 Cal.App.2d 41 [245 P.2d 316] involved a chicken bone in a chicken pie and is indistinguishable from *Mix,* and in *Silva* v. *F. W. Woolworth Co.* (1938) 28 Cal.App.2d 649 [83 P.2d 76], the plaintiff choked on a turkey bone contained in dressing. The court's analysis in *Silva* failed to consider whether the consumer should expect to find a bone in dressing, or whether it was common knowledge that dressing contains bones.

Our review of cases from other jurisdictions reveals that we are in precisely the same situation faced by the Louisiana Court of Appeal in *Loyacano* v. *Continental Insurance Company* (La.App. 1973) 283 So.2d 302. In the *Loyacano* case, the plaintiff purchased a sealed package of ground meat from the defendant. She made patties from the meat, cooked them, then broke her tooth on a hard substance when she bit into one of the patties. (The hard substance was probably a bone because other pieces of bone were found to be remaining in the uneaten part of the patty.) As in this case, the record was incomplete regarding the existence of bone in hamburger patties. The court ultimately concluded that the reasonableness of a consumer's expectations and the due care exercised by the manufacturer were triable issues of fact which could be (and were) decided against the defendants. However, in order to arrive at this conclusion, the court was faced with the problem of distinguishing an earlier Louisiana precedent, *Musso* v. *Picadilly Cafeterias, Inc.* (La.Ct.App. 1965) 178 So.2d 421, in which the plaintiff sustained serious mouth and jaw injuries when she bit into a cherry pit contained in a cherry pie.[5] *Musso* relied in large part upon the *Mix* case in deciding that the pit was natural to the cherry, and "common knowledge and experience impels the conclusion no cuisine expert would separately probe each supposedly pitted cherry before incorporating same into a pie intended for his own consumption." (178 So.2d at p. 428.)

Though faced with the *Musso* court's adoption of the *Mix* rule, the *Loyacano* court was nonetheless convinced that there were triable issues of fact when a piece of bone in hamburger meat is involved. Wrote the court, "there is no evidence in the present case concerning the probability of pieces of bone appearing in hamburger. Simply as a matter of general knowledge, we cannot say that we can take judicial notice that a hamburger patty should not contain any pieces of bone whatsoever. The ground meat in question was prepared from trimmings of other cuts of meat and scrapings from bones. . . . The record does not make us aware of how large a piece of bone must be in order to stop the blade [of the grinder], nor how small a piece of bone may be and yet go through the blade." (283 So.2d at p. 305.) The court found that because there was no showing that the plaintiff was negligent in her handling of the meat, it was incumbent upon the defendant to prove that the size and quantity of bone contained in its meat was no larger or greater than that which the consumer would reasonably expect. And the defendant must show that it exercised the same care as that which a reasonably prudent man skilled in the art of meat handling would exercise in the removal of bones from meat. (*Id.* at p. 306.)

Eleven years after *Loyacano* was decided, the same court was called upon to review a case in which the plaintiff was injured when he bit into an oyster

[5] A cherry pit in a cherry pie is, of course, expressly listed in the *Mix* case as an example of a case in which no recovery should be allowed as a matter of law.

containing a pearl. In that case, *Title* v. *Pontchartrain Hotel* (La.Ct.App. 1984) 449 So.2d 677, the court took the opportunity to explain the relationship between *Musso* (which used the "foreign-natural" test from *Mix*), and *Loyacano* (which seemed to use a "reasonable expectation" test). The court in *Title* stated that the two cases are actually not incompatible with each other, and that the *Loyacano* decision did not repudiate the *Musso* foreign-natural test. Rather, the analysis must be made in two steps, each using a different test. ■ ■■■■ In the first step, it is determined whether the object causing the injury is foreign or natural. If the harmful substance is foreign, the defendant is strictly liable and the analysis stops.[6] If the substance is natural, the second step is to determine whether the manufacturer or processor negligently allowed it to remain in the final product sold to the injured consumer. (449 So.2d at pp. 679-680.) Applying this analysis to the facts before it, the court concluded that a pearl was "natural," but "very unusual and unexpected"; i.e., the court was clearly unwilling to state as a matter of law that it is common knowledge a pearl should be anticipated by consumers of oysters. Nonetheless, the court's review of the evidence presented at trial revealed that the defendant took every reasonable precaution available to it to avoid serving harmful oysters; therefore, defendant was not liable for plaintiff's injury. (449 So.2d at p. 680.)

■ We agree with the *Loyacano* and *Title* decisions that the reasonableness of the supplier's manufacturing process is a question for the trier of fact in cases where it is not a matter of common knowledge that natural, but potentially harmful, substances are likely to exist in the final product being sold to the consumer.[7] Our conclusion does not ignore the Supreme Court's admonition in *Mix* that no food purveyor is responsible for serving "perfect" food. We are not requiring that the respondents' hamburgers be perfect, only that they be fit for their intended purpose. It is difficult to conceive of how a consumer might guard against the type of injury present here, short of removing the hamburger from its bun, breaking it apart and inspecting its small components. While this might be a viable option with a chunk of chicken in a chicken pot pie, or with a T-bone steak, we doubt that any hamburger manufacturer seriously expects consumers to go to such lengths, especially since a hamburger sandwich is meant to be eaten out of

---

[6] It would appear that in California the defendant is not strictly liable even if broken glass, an obviously foreign object, is the source of the plaintiff's injuries. (*Goetten* v. *Owl Drug Co.* (1936) 6 Cal.2d 683 [59 P.2d 142].)

[7] The evidence in the instant case may eventually show that no bone large enough to break a tooth could pass through the grinder. From this, the trier of fact might infer that the "hard substance" which broke Evart's tooth was not a bone at all but rather a foreign object which somehow made its way into defendants' meat after the meat had passed through the grinding process. On the other hand, the trier of fact might infer that there was something wrong with Evart's teeth if they could be broken by a minuscule object.

hand, without cutting, slicing, or even the use of a fork or knife. Finally, our conclusion is supported by the Legislature's acknowledgment in 1970 that while a food may legitimately contain "natural" substances, these substances may only be present in quantities which are not injurious to health. (Health & Saf. Code, § 26520, *supra,* added by Stats. 1970, ch. 1573, § 5.)

## DISPOSITION

The judgment is reversed. Each side to bear its own costs on appeal.

Lucas, P. J., and Ashby, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 31, 1989.